# In the United States Court of Federal Claims

No. 19-1628L
(Filed: May 28, 2020)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

L & W CONSTRUCTION LLC and
BONNIE LYNN,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Takings; 28 U.S.C. §
1491(a)(1) (2018); 28
U.S.C. § 2501 (2018);
28 U.S.C. § 1500
(2018); RCFC
12(b)(1); RCFC
12(b)(6); motion to
dismiss; regulatory
taking; physical taking;
nuisance; statute of
limitations; first-filed
rule.

*Jared S. Pettinato*, Washington, DC, for plaintiffs. *Matthew D. Thurlow*, of counsel.

*Davené D. Walker*, Trial Attorney, United States Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, DC, with whom was *Jean E. Williams*, Deputy Assistant Attorney General, and *Prerak Shah*, Deputy Assistant Attorney General, for defendant.

## OPINION

BRUGGINK, *Judge*.

The United States, acting through the National Park Service and U.S. Forest Service, manages the bison population in Yellowstone National Park and on the surrounding National Forest land. As part of a joint federal, state, and tribal management plan, the United States permits a number of the bison to be hunted outside of Yellowstone National Park each year. Plaintiffs allege that the hunting program has effected a temporary regulatory taking of plaintiffs' property by creating an atmosphere of danger and decreasing the rental value of their property. Plaintiffs also allege that the hunting program

has effected a temporary physical taking when carrion birds transport bison offal onto plaintiffs' property.

Pending is defendant's motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to  state a claim on which relief can be granted. The motion is fully briefed, and the court held oral argument on May 22, 2020. Because the court lacks jurisdiction over plaintiffs' claim and plaintiffs failed to state a claim on which relief can be granted, we grant the government's motion.

BACKGROUND[1]

The National Park Service manages Yellowstone National Park and the Forest Service manages the National Forest lands outside of Yellowstone. Part of managing that property involves stewarding the bison population that roams federal land. Since 1923, the Secretary of the Interior, who oversees the National Park Service, has had the authority to dispose of surplus bison. Compl. ¶ 13 (quoting 16 U.S.C. §§ 21, 36 (2018)). The Forest Service has the authority to regulate use and occupancy of the National Forest System, including dictating where hunting may occur within the National Forests. Compl. ¶ 14 (quoting 16 U.S.C. § 551 (2018)).

Beginning in the 1990s, these federal agencies worked with state agencies and tribes to develop a joint plan to manage the bison population that roams both on and off federal land. These parties coordinated to issue the Interagency Bison Management Plan in 2000 ("the 2000 Plan") that would promote bison management in accordance with federal statutes, state statutes, and tribal treaty rights. The 2000 Plan detailed the difficult history of bison management, analyzed several alternatives for bison management, and set out the committee's plan to use a number of bison management tools. One of the options for bison management considered in the 2000 Plan was to allow a number of bison to be hunted outside of Yellowstone National Park.

The 2000 Plan noted that such a hunt would require approval by the Montana legislature regarding the details of the hunt. Several tribes also had distinct hunting rights. The land where the hunt would occur was partly owned by the United States and partly owned by the state of Montana. In 2004, the Montana legislature authorized and set the terms of an annual bison

---

[1] The background draws from plaintiffs' complaint and the 2000 Interagency Bison Management Plan, which plaintiffs rely on in the complaint and which defendant attached to its motion.

hunt to occur on public land. The first hunt following this approval was in the winter of 2005.[2]

Beginning at least as early as 2005, state-licensed hunters and members of tribes have hunted the bison on publicly held land (some federal, some state) that is near private property. During the winters from 2005 to 2012, the yearly hunt occurred and the total hunted bison killed ranged from 27 bison in 2005 to 174 bison in 2012. Plaintiffs assert that the "hunting has intensified in an unpredictable way since 2005" and that "[h]unting has dramatically intensified since 2012." Compl. ¶¶ 30, 48. Due to growing interest in hunting bison each year, since 2015, the Forest Service has closed certain acres of National Forest property to hunting. The state of Montana has also proposed limiting the area where state-licensed hunters may hunt bison, although the yearly winter hunt has continued through 2019. In the years following the 2000 Plan, the Interagency Bison Management organization, which includes federal, state, and tribal representatives, has issued yearly operational updates on bison management.

The hunters gut the bison where they are killed and leave offal behind. Raptors and ravens feed on the offal, transporting it from public land onto plaintiffs' property. The bison guts may transmit bacteria that causes illness in humans and uncurable brucellosis in cows.

Plaintiffs here are Bonnie Lynn and L & W Construction, LLC, of which Ms. Lynn is the sole owner. In 2005, plaintiffs purchased two cabins on private property located outside of the entrance to Yellowstone that is near where the yearly hunt occurs.[3] Plaintiffs' property is "across the road" from where the hunt happens. Compl. ¶¶ 1, 8. In 2005 and for some years after, plaintiffs rented the cabins to tourists who visited Yellowstone National Park to experience the park and see the bison.

As hunting escalated, particularly since the hunt in the winter of 2012-2013, plaintiffs have had difficulty renting their cabins during the hunting season. Because hunters are firing at, killing, and gutting bison as close as a

---

[2] The 2005 hunt appears to be the first public hunt following the 2000 Plan and Montana's approval. Plaintiffs' complaint refers to bison hunting as early as 2000, however. Compl. ¶ 28.

[3] The complaint also states that Ms. Lynn also owns a plot of property north of the boundary of Yellowstone National Park. Compl. ¶ 8. The complaint does not identify when Ms. Lynn or her company purchased this property.

few hundred yards away, the danger, noise, and gore has deterred visitors. Furthermore, "[e]very year, the raptors and ravens drop potentially infected bison guts on Ms. Lynn's land." Compl. ¶ 57. The hunts have decreased interest in plaintiffs' property and they have been unable to sell the property.

Plaintiffs do not allege in the complaint that the hunt itself occurs on their property nor do plaintiffs allege that government officials, hunters, bullets, or live bison enter their property before, during, or after the hunt. The only physical impact alleged in the complaint is the bison offal dropped on the property by carrion birds.

To receive compensation for the decreased value of their property, plaintiffs filed this suit on October 18, 2019. Three days later, on October 21, 2019, Ms. Lynn and an organization filed a lawsuit in federal district court alleging violations of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (2018), and National Environmental Policy Act, 42 U.S.C. § 4321 (2018).

DISCUSSION

Plaintiffs allege that the United States has taken their property without just compensation in two ways. In Count I, plaintiffs allege that the United States has "effectively create[d] an easement on" plaintiffs' property by allowing "repeated, temporary regulatory impacts" in the form of the hunt on nearby public land to the detriment of plaintiffs' property value. Compl. ¶¶ 51-54. In Count II, plaintiffs claim that the United States has temporarily, physically occupied their property by allowing bison offal to stay on the federal land that birds later strew across plaintiffs' property.

The United States responds that the court may not entertain plaintiffs' taking claim because they failed to bring their claim within the six-year statute of limitations period. Defendant also argues that this court lacks subject matter jurisdiction over plaintiffs' claim because it depends on a tort-based, failure-to-act theory. Alternatively, defendant contends that plaintiffs failed to state a claim in their complaint on which this court may grant relief. Finally, the United States argues that this court must dismiss plaintiffs' suit because plaintiff Bonnie Lynn has a similar action pending in federal district court. We address these arguments below, beginning with the statute of limitations, before examining the substance of plaintiffs' claim, and concluding with the argument under 28 U.S.C. § 1500 (2018).

4

First, we agree that plaintiffs' takings claim was not filed within the six-year statute of limitations period. This court has jurisdiction over claims "filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2018). The statute of limitations is a jurisdictional requirement that cannot be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008). When defendant moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the court assumes the undisputed facts in the complaint are true and draws all reasonable inferences in plaintiffs' favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). Plaintiffs must plead facts sufficient to invoke this court's jurisdiction. *Id.* The court may consider facts beyond the pleadings to determine whether subject matter jurisdiction exists. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). A Fifth Amendment takings claim accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013). The government act that causes accrual of a takings claim is the act that constitutes the taking. *Id.*

Because plaintiffs filed their complaint on October 18, 2019, their claim must have accrued on or after October 18, 2013, for their complaint to be timely filed. Count I alleges that the authorization of the hunt and failure to properly manage the hunt constitute a temporary taking of plaintiffs' property. Count II alleges that the bison offal dropped on their property is a physical taking. In their complaint, plaintiffs allege the following facts in support: that the 2000 Plan was the regulation that permitted the bison hunt, the hunt began at least as early as 2005, plaintiffs purchased their property in 2005, and the hunt intensified in the winter of 2012 and each year thereafter. Plaintiffs state that carrion birds carry the guts onto their property every year.

Accepting the facts as pled, all of the events fixing liability would have occurred by 2005 and, in any event, no later than the winter of 2012-13. 2005 marked the confluence of the alleged government regulation of public land, plaintiffs owning property across the road, the hunt occurring, and hunters leaving bison guts behind. The six-year limitations period for a claim accruing in 2005 has long since expired. Alternatively, plaintiffs allege that the hunt problematically intensified in the winter of 2012-2013, writing, "Hunting has dramatically intensified since 2012." Compl. ¶ 30. Given that plaintiffs owned the property in 2012, that the hunt occurred in 2012, and that plaintiffs were aware of the hunt's existence and intensity as of the 2012 hunt, the limitations period began to run no later than the 2012 hunt. Even

so, plaintiffs filed their complaint nearly a year beyond the six-year limitations period beginning in winter 2012.

In plaintiffs' response to the motion to dismiss, they argue that neither the 2005 first hunt nor the 2012 more intense hunt set the date for when the six-year limitations period began. Instead, plaintiffs argue that the harm is continual and that a new accrual date is available every year beginning with 2013 when the Interagency Bison Management organization issues its annual update on bison management. Additionally, plaintiffs argue that the agencies' approach to bison management has not stabilized in nearly fifteen years, because more hunters have participated each year and the Forest Service has occasionally limited the National Forest land available for the hunt.

We disagree. Plaintiffs complaint alleges that the 2000 Plan authorized the hunt and that it has occurred every year since 2005, with no reference to yearly operations updates. Plaintiffs have owned the property at all relevant times and have been aware of, and in fact have disputed the legality of, the hunt since that time. Moreover, the operations updates that plaintiffs attached to their response to the motion to dismiss refer back to the 2000 Plan, do not purport to authorize the yearly bison hunt, and explain which specific state and tribal authorities authorize and regulate the yearly public hunt.

Furthermore, the stabilization doctrine that plaintiffs rely on was narrowly articulated in *Dickinson v. United States*, where the Supreme Court held that plaintiffs could bring suit more than six years after the beginning of planned, gradual yearly flooding of their property due to a dam that the United States installed. 331 U.S. 745, 745-50 (1947). As defendant points out, the stabilization doctrine does not apply here where the 2000 Plan and its progeny have had the same impact on the private property since the public hunt began. All of the events fixing the government's liability began as early as 2005 and were fixed at least as of 2012, as set out in plaintiffs' complaint, and plaintiffs' attempt to shift that date is unavailing. Plaintiffs' complaint must therefore be dismissed for lack of jurisdiction because it was filed outside of the statute of limitations period.

Even if plaintiffs had filed their complaint within the limitations period, the government argues that the substance of the complaint sounds in tort, which is outside of this court's jurisdiction. This court has jurisdiction over claims against the United States founded on "the Constitution, or any Act of Congress or any regulation of an executive department, or upon any

express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2018). A federal agency failing to exercise its authority does not constitute a taking under the Fifth Amendment; instead a failure-to-act claim sounds in tort. *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018); *Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998). "Takings liability must be premised on affirmative government actions." *St. Bernard Parish Gov't*, 887 F.3d at 1362. Additionally, a takings claim assumes the legality of the government's action. *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1365-66 (Fed. Cir. 2001)*.*

In Count I, plaintiffs allege that the United States authorized the bison hunt and has thereafter failed to exercise its authority to safely manage the hunt. In Count II, plaintiffs allege that the United States' mismanagement of the hunt, presumably by allowing too much hunting or not requiring disposal of the gut piles, has the downstream effect of exposing plaintiffs' property to bacteria-ridden bison guts brought there by birds. In substance, what plaintiffs allege is that they are entitled to damages for the government's failure to exercise its regulatory authority, or improper exercise of its regulatory authority, over federal property. In either scenario, the government's failure to act or unlawful action does not constitute a taking. Plaintiffs may have a tort remedy for the United States' alleged failure to act to stop unsafe action on federal land, but the assertions do not state a takings claim over which this court has jurisdiction.

Alternatively, to the extent that plaintiffs argue that the current regulation of federal land is arbitrary and capricious, runs afoul of the agencies' authority to regulate, or fails to take relevant factors into account, plaintiffs are asserting that the government's action or inaction violates applicable statutes or regulations. In other words, they are making an Administrative Procedure Act claim, over which this court likewise does not have jurisdiction. Whether viewed as a challenge to the government's regulatory process relating to bison management or a failure-to-act to ensure the hunt is safe for neighboring property and persons, the claim does not come within this court's subject matter jurisdiction.

Pivoting from jurisdiction, defendant also argues in the alternative that, under RCFC 12(b)(6), plaintiffs fail to state a claim upon which this court can grant relief. When considering a motion under RCFC 12(b)(6), the court accepts all well-pleaded factual allegations as true, but "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* Notably, legal conclusions are not assumed to be true. *Id.*

We agree with the government that, even if we had subject matter jurisdiction, the complaint fails to state a claim on which relief can be granted. Plaintiffs cast their takings claim as either a temporary regulatory taking or a temporary physical taking. Under either theory, the foundational components of a takings claim under the Fifth Amendment are that the United States has invaded or appropriated a protected property interest for a public purpose and failed to compensate the property owner. Accepting the facts in plaintiffs' complaint as true, essential components of a takings claim are missing.

Regarding Count I, plaintiffs frame their takings claim as a "temporary taking" that has "effectively create[d] an easement," Compl. ¶ 53-54, but plaintiffs have not asserted that *their property* has been the subject of regulation. The hunt happens on public property, not plaintiffs' property. Each of the regulatory takings cases that plaintiffs cite involved regulation of the claimant's property. *E.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 611 (2001) (Rhode Island denied landowner's application to fill his wetlands property and construct a beach club); *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1304-06 (Fed. Cir. 2015) (tomato producers alleged that FDA press releases and media statements warning consumers that particular tomatoes may carry salmonella bacteria decreased the market value of their tomatoes). In this case, on the contrary, plaintiffs assert that federal regulation of other land indirectly impacts their interests. The hunt is confined to public land, and plaintiffs merely allege that they can see and hear the hunt from their property and that visitors have been scared away.

This amounts to a classic nuisance claim. A nuisance is "a non-trespassory invasion of another's interest in the private use and enjoyment of land." Rest 2d Torts § 821D. Because it sounds in tort, a nuisance claim is outside of this court's jurisdiction. *Avery v. United States*, 330 F.2d 640, 644-45 (Ct. Cl. 1964). The difference between inverse condemnation and a nuisance, or other tort, is measured by whether the government has intentionally invaded a protected property interest, or the invasion is the natural result of authorized activity, and whether that invasion appropriates to the government a benefit at the expense of the property owner beyond a reduction in value. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (holding that a takings claim must be considered where the

construction of a United States Postal Service facility increased storm drainage onto claimant's property).

Here, plaintiffs' complaint alleges only a reduction in value due to a noxious use of adjoining public land. They concede that the United States has not intentionally invaded their property[4] but argue that dangerous conditions are a natural effect of a hunt on public land. Plaintiffs rely on *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012), and *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922), but, in both of those cases, government action resulted in a direct physical invasion of the claimant's property. In *Arkansas Game & Fish*, the Army Corps of Engineers operated a dam in such a way that resulted in repeated flooding of a wildlife management area and destruction of trees. 568 U.S. at 26. In *Portsmouth*, the United States constructed a military installment and a firing range on two sides of a summer resort with the stated intent to fire across the private property. 260 U.S. at 328. In both cases the Supreme Court determined that the claimant could state a claim for the direct physical impacts.

Despite concluding that the United States has "effectively" created an easement[5] on their property through the "repeated, temporary regulatory impacts," plaintiffs' complaint does not allege that the government has intruded onto plaintiffs' property. Plaintiffs and their visitors can only see and hear the hunt on public land. Plaintiffs' case is more analogous to *Avery* in which the Court of Claims concluded that certain property owners who experienced noise, smoke, and vibration as a result of nearby flyovers had not stated a takings claim but a nuisance claim. 330 F.2d at 644-45.

---

[4] "Ms. Lynn does not claim that the Agencies intended to take her properties directly, so the first part of the first element [of an inverse condemnation claim] does not apply." Resp. to Mot. to Dismiss 29. Furthermore, at oral argument, plaintiffs argued that the danger and disruption caused by the hunt were not foreseen, or at least not intended, by the Interagency Bison Management committee.

[5] Plaintiffs' Count I conflates the definition of a temporary, regulatory taking with an easement. "An easement is a 'nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.'" *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 105 (2014) (quoting Restatement (Third) of Property: Servitudes § 1.2(1) (1998)). Although plaintiffs allege that the United States has "effectively create[d] an easement," Compl. ¶ 53, the facts relied on do not support that legal conclusion.

Furthermore, a mere reduction of property value due to a change in the use of public property is not sufficient to state a takings claim. *See Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1379 (Fed. Cir. 2008); *Ridge Line, Inc.*, 346 F.3d at 1356. Simply put, although the nearby hunt may cause noise and unsightly scenes, the use of public land in a non-trespassory manner does not amount to a taking.

Count II has another deficiency. The actor in a Fifth Amendment takings claim against the United States must be the United States. Plaintiffs allege that the United States allows the hunt on federal land, that hunters kill the bison and leave the guts behind, and that at some point thereafter carrion birds carry the guts onto plaintiffs' property. Plaintiffs contend that the carrion birds are instrumentalities of the United States, because the United States should expect birds to scatter remains left in the open. Plaintiffs' assertion is insufficient. Wild animals, acting on their own impulse, are not instrumentalities of the United States. *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995). Nor is the fact that one could foresee animals acting in that manner the test of a physical taking, which assumes intentional government conduct directly impacting private property. A mere causal link through the agency of a third force, perhaps appropriate in a tort context, is not sufficient to allege a taking. As discussed earlier, to the extent the United States is improperly exercising its regulatory authority or allowing a nuisance to persist on public land, plaintiffs' claim sounds in tort.

To resolve the shortcomings in both Counts I and II, plaintiffs offered during oral argument to amend the complaint to assert that individual hunters have occasionally trespassed on plaintiffs' property and that bullets have been fired carelessly and come onto plaintiffs' property. Such an amendment would not be helpful to plaintiffs' claim, however. Those assertions also ultimately sound in tort. Plaintiffs have not alleged that any federal bison management regulations permit any such third-party, private actors, licensed by state or tribal authorities, to enter onto or use plaintiffs' property during the hunt.

Finally, the government also argues that plaintiffs' federal district court claim, filed after plaintiffs' suit in this court, triggers dismissal of this action due to the operation of 28 U.S.C. § 1500 (2018). Section 1500 divests this court of jurisdiction over "any claim for or in respect to which" plaintiffs have "pending in any other court any suit or process against the United States." Section 1500 applies if an "earlier-filed 'suit or process' [is] pending in another court," and "the claims asserted in the earlier-filed case are 'for or in respect to' the same claim(s) asserted in the later-filed Court of Federal

Claims action." *Brandt v. United States*, 710 F.3d 1369, 1374 (Fed. Cir. 2013) (quoting 28 U.S.C. § 1500).  As the government candidly admits, however, the current state of the law in this circuit is that Section 1500 does not apply when the district court proceeding is filed after the action filed in this court, as it was here.

Plaintiffs' claim is, nevertheless, outside of this court's jurisdiction for other reasons, and, in any event, fails to state a claim on which relief can be granted.  The complaint therefore must be dismissed.

CONCLUSION

For the reasons stated above, the government's motion to dismiss is granted pursuant to RCFC 12(b)(1) and, alternatively, RCFC 12(b)(6).  The Clerk is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge